of America, 15 minutes per side. Mr. Parsons for appellants. May it please the court, your honors. I'm Kent Parsons. I'm from Baton Rouge, Louisiana, and I'm here today representing the gentlemen that are the guardians of the United States of the children of Tracy Burke and also Karen Comer's estate. Two individuals, as you know from the pleadings, were tragically murdered by Brent Burke on September 11, 2007. This case and what we have brought here today against the government is a case that springs from an incredibly noble, wholesome, good, and appropriate duty as set forth in policy 7 of the Army's own internal regulations. Can you just tell me what exactly, specifically, is the source of the Army's liability for Burke's actions under Kentucky state law? Under Kentucky state law, there is a duty that arises when an undertaking occurs, and it's restatement of torts 2, 324A, and in this particular instance, policy 7 expressed a duty that the Army had not to regulate its soldiers, but to protect those in need of an instance of domestic violence. And we had a domestic violence incident specifically occur on May 26, 2011. On that date, the Army intervened and employed policy 7. Policy 7 contains within it not just the duty under Kentucky law, which creates a statutory duty, if you will, to comply with it, but it's mandatory. So policy 7 contains within it, it's like a spoke out of which the foreseeability elements of the harm to which Tracy was exposed, beginning on that day, that day, May 26, and it continued and escalated and did not go away for 108 days, all the way until September. Does policy 7 have a 48 hour rule? It's got a 48 hour cooling off rule that says you have to go to the barracks and you must cool off. And that is a mandatory rule. What we've not had an opportunity to do is develop the record. We believe that we are going to be able to produce and adduce evidence in the record that that rule was violated as well. But not a single, we have, what we do know is that the rule that requires confiscation of the weapon was not followed. Your emphasis in your brief under the policy 7 is mainly focused on the guns situation. That is that the guns were not, as I understand it, they were killed with a government issued weapon? No, it was not a government issued weapon. The 9mm pistol was private? It was privately owned and the rule in the enclosure attached to policy 7, which policy 7 itself says these are minimum actions that will be taken. There's not anything in policy 7 that is anywhere close to discretionary. And so here they confiscated his weapons, but your part of it was they gave them back to him? No, excuse me. They did not confiscate the weapon, although they marked on the enclosure that they had on May 26th. But during this series of events leading up to this, at one point didn't they confiscate his weapons? One of his colleagues, a fellow military policeman by the name of Sergeant Dean, who is now deceased. Sergeant Dean took his weapon because he was escalating the threats. He was telling people, he told a soldier outside the barracks in June after the first event, I'm going to take her into the woods, and I'm not going to use the word he said, but I'm going to kill her. That was reported to his commanding officer and his commanding officer concluded that he was blowing off steam. Well tragically he was not blowing off steam. Then the next domestic violence incident that was reported but policy 7 was not even implemented, unlike it was on May 26th, was August the 11th. He was following around Clarksville, Tennessee in Fort Campbell. She calls the police. First she calls her brother, who calls the police, and because no military protective order, which is required to be issued under policy 7 on May 26th, had been issued, the Clarksville police didn't do anything and neither did the military. Then in August, I'm getting to your point, sometime around August 15th, Sergeant Dean took his weapon from him because he said he was going to kill Tracy. On August the 31st, he went to Sergeant Parker's office and went to Sergeant Dean and said, can I have my gun back? I want to go shoot some hogs on my uncle's property. He gave his gun back and ten days later Tracy was murdered and so was Karen Comer. So the duty arises out of policy 7. What does policy 7 do here? First of all, it's mandatory. There's no discretion in this thing. There's not a could be, should have, would have. It's you will do this officers. And this, please remember, this was a policy of the Army to protect somebody who's not even in the military and is not an employee of the federal government. It says the greater the crisis, the greater the crisis, the greater the need to move quickly to afford the protection to the individuals needing protection. That's in paragraph 2 of policy 7. And then policy 7 goes on to say this is what you will do. It even has, it's so specific and precise and mandatory that it says the grade of the officer that must confiscate the weapon. So I can tell you when the negligent acts of failure, now this is an undertaking the Army wrote down and is explicit. This isn't an undertaking where you just take a branch back and let the branch go and it hits somebody and puts their eye out. This is an undertaking that happens to be written down and be specific. What I'm struggling with is that you've got to fit yourself within Kentucky law. Yes ma'am. There's no question of that. And I think there are three basic ways you can do that and I understand that you're in the third one. But the requirement of that is that you have induced reliance in that party. Help me, I'm not finding a reliance argument in the pleadings because there's the statement that they didn't do anything at all. So help me understand how you've alleged that. We have specifically alleged in our amended complaint that Tracy called his commanding officer after the May 26th incident. And she said two things. I'm afraid of him, he's still threatening to kill me. And he still has his gun. Contrary to the express dictates of Policy 7. So she relied on, and the other thing, the way I read the restatement is the reliance element, it's the three elements of the restatement, reliance, it's in the disjunctive as I understand it and as I read it. So reliance is, but even if it is required, your honor, we have reliance. We absolutely have reliance. Can you tell me with specificity where you've alleged that? Or come back in your, yes ma'am. So out of the spoke or the fulcrum of Policy 7 emanates the foreseeability element. And the foreseeability element is necessary under Kentucky law before there exists negligence. Now I've heard, and the district court made a point of saying there's no duty under Kentucky law to warn somebody of something they already know that they're in danger of. Well respectfully there's no case law that says that because I don't believe that to be the law. The Pathways v. Hammonds case decided by the Kentucky Supreme Court specifically says that negligence is determined based upon not what is in the victims of the tort's mind, it's in the tortfeasor's mind. What did they know? So what did the Army know here? They knew they had a very good record of what happened. They knew exactly when the events began, this 108 days began. He'd been deployed, he had been sent home from Egypt. Tell me, it is a horrifying record. I don't think anybody's going to dispute that. If you had discovery, what is it that you anticipate document wise or evidentiary wise would establish that your client relied on the Army's policy? I believe we're going to find out that there were numerous calls to his commanding officer letting him know, I need help here, I'm afraid. And she ended up trying to get away from him because she was not sure that she was going to, he was living in the barracks, I think we're going to find out that he had been ordered to the barracks, but I think we're going to find out that he was, because what we know, this isn't in the record and I want to be clear about that, but I think what we're going to find out is that he was going to her house in the middle of the night and standing over her bed when he should have, if he had a military protective order, which had been issued, he wouldn't have been able to do. So she was... He wouldn't have been able to do or he would have been in trouble if he had done it. He would have been in a lot of trouble if he had confiscated. It would have been in the arms armory room and in order to get it out he would have had to check it out. So there were lots of things that she was expecting the army to do in the context of this reliance. Are you saying that the negligence arises from the treatment of the guns by the sergeant and others as well as not issuing a protective order? Those are the two major elements, would you say, of the negligence? I think that those are some of them, but also the Kentucky Revised Statute that creates the Tarasoff warning, if you will, the duty of the psychiatrist to report threats. No ma'am, we did not abandon that. That was suggested by opposing counsel in his brief. We have not abandoned that argument. No ma'am. Is it briefed? We briefed it at the lower court level and we didn't brief it specifically to you, but we have not abandoned that. It's something that we're claiming. And the reason we can't brief it real thoroughly is because we don't know, but that's discovery that we're going to be seeking. There's no jury trial on the federal tort claim. No sir, there is not. Your trial, you haven't had a trial, but your trial would be before the year after you get discovery. Yes ma'am. Yes sir. Yes sir. You would contemplate putting on witnesses and so on. Absolutely. Absolutely. There will be a lot of discovery that would need to be done. And may I continue answering your inquiry about the Tarasoff warning portion of the Kentucky revised statutes that we have not abandoned. It's the duties that the officers who were charged, not with making judgments about, but charged to implement the confiscation of the weapons, issuing the military protective order, referring him to mental health, that's another element that you were referencing, what are the various things. And all of these things. And giving him the gun back. Taking the gun from him and then giving it back. Thank you. You'll have your rebuttal time. Good morning and may it please the court. Ben Schechter on behalf of the United States. And let me begin by saying there's absolutely no denying the tragic events that occurred in the morning of September 11, 2007 in Ryanville, Kentucky. When Sgt. Burke traveled 150 miles from Fort Campbell and murdered Mrs. Burke and her ex-mother-in-law. There's no question that the bullets that killed them were from his private gun, is that correct? Yes. A weapon that was never recovered, but yes. That does not mean, however, that sovereign immunity has been waived in this case for the United States. And as this court is well aware, 28 U.S.C. 1346 B.1 is the Federal Tort Claims Act, where there is a waiver of sovereign immunity for certain types of torts in a jurisdiction, just as though a private person would have been held accountable for tort liability. However, there are two exceptions to that. One is the intentional tort exception, which is what the district court held applicable here. The other is the discretionary function exception, which the district court never got to, but we believe is equally applicable. But you do have in Kentucky the Good Samaritan principle that has been applied. Absolutely, Judge Mayer. And so what's your answer to that in light of the fact that the government, the Army, issued Policy 7 setting out certain rules, certain regulations as to how to handle this, and which arguably at least were not followed. That is, when you look at the evidence, the gun problem and the others that he's mentioned, there's evidence that they were not followed. What's your answer to the argument under the restatement? Right. There's 324A of the restatement, and frankly, probably more applicable here would be 323 of the restatement, which they're essentially one and the same other. 324A is for a third party. But if you'll indulge me, I'll go through that analysis for you, Judge Mayer. First, you start with this court's holding in Satterfield, and what does any claim arising out of an assault and battery in this case? The arising out of language is quite broad, but it is not limitless, as you've noted. And in Sheridan, the Supreme Court held that there may be special relationships. However, those special relationships must be entirely independent of the employment relationship the assailant had with, in this Part of the special relationship is because he was in the Army, but the second part or the other part is that the Army had a policy which was stated about protection. So you got, that creates somewhat of a special relationship too, doesn't it? The policy 7 does not create a special relationship. And the preamble type language where it talks about the need to protect our military community, the need to recognize domestic violence is an issue. But if you look at what policy 7 is, and you look at how it came to be, it came through the Army's Family Advocacy Program, which recognizes, in part, how are we going to train our unit commanders to supervise their employees in the context of a domestic violence situation? And policy 7, everything that's discussed in that checklist, goes to, at its core, the supervision of Sergeant Burke, in this case, as an Army soldier. It does not create independent duties to, in this case, Mrs. Burke. And I think the plaintiffs recognized this when they said, if neither Sergeant Burke were a soldier nor Tracy Burke were a soldier, policy 7 would have no applicability to the situation. And I think that's how we have to look at this under Kentucky law and the Good Samaritan Doctrine. We have to remove Sergeant Burke as an employee of the Army and treat him, the assailant, as though he were simply Mr. Burke. And therefore, does policy 7... Now, the fact that he is in the Army and has been and has made all these statements while he was in the Army, is irrelevant to the question of, under the Federal Tort Claims Act? It's irrelevant? That he is, for purposes of this special relationship, yes. The assailant's... And it becomes irrelevant because... why? Because there cannot be... the intentional tort exception has not been erased by Sheridan. Satterfield holds, this Court has held, that you cannot, in the context of an intentional tort exception, cloak your claims in terms of negligent supervision. And that's exactly what the plaintiffs are alleging here. That's exactly what policy 7 is. It is how will the military supervise an employee, its employee, who has been involved in a domestic violence situation? How will that unit commander react in that situation? That is not actionable. We have to remove policy 7 from this analysis. But the whole policy, though, was designed, or it seems to have as its basis, protection of those families, which sort of envisions that when the policy is not properly implemented or adhered to, that some intentional, harmful, in this case, deadly activity could occur. So what could be the rationale for, as you say, removing that because the ultimate action here was, in fact, intentional? That's right. The reason it's removed from the analysis is because it is at its core... But the policy, you see, would seem to foresee that if we don't have this policy, people could go off and do the kinds of things that Mr. Burke ultimately did. And so if we follow your analysis, it seemingly would obviate the need for policy 7. Why would you even have it? Because I think it does recognize that that is an issue within the military community, and I think there is a recognition that domestic violence poses a problem for soldiers and their, in this case, spouses. So if it recognizes that and the policy is in place to prevent this kind of stuff, when it ultimately occurs, we just say, oh, well, too bad? Is that what you're telling us? No. What I'm telling you is that there needs to be a special relationship under Kentucky law, and policy 7 does not get you to that special relationship. The Good Samaritan Doctrine does not apply within the context of linking it to policy 7. You have to remove policy 7 from the analysis. And I'll give the Court an example of how the intentional toward exception does not apply in the context of this. Let's presume that Sergeant Burke, in the events of May of 2007, and a weapon was brandished. Well, policy 7, of course, sends him to see a psychiatrist in that situation. The Tear Us Off Doctrine, which was mentioned earlier and is codified in Kentucky, puts a duty on the psychiatrist. At that point, if Sergeant Burke had told the psychiatrist, the minute I leave here, I'm going to go out, I'm going to get my relationship, which is irrespective of Sergeant Burke's employment status. He is now a patient of the psychiatrist, and that psychiatrist now has an affirmative duty, despite the fact that an intentional tort ultimately occurred, but that psychiatrist has an affirmative duty to warn Mrs. Burke under Kentucky law and under the special relationship, in that case, being a psychiatrist. If we don't agree with you that being in the Army is irrelevant, but think it is relevant because it's part of the chain of events that occurred, then do you have an alternative argument? I do, Your Honor, and that would be the discretionary function exception. And as this Court is well aware, under 28 U.S.C. 2680A, the United States cannot be held liable for a discretionary act, even if that discretionary act were negligent. And you look at Gobert, which is the two-part test, and Rosebush, which is the Sixth Circuit's decision, which discusses that, and you first look to see, is there an element of judgment or choice? And then once there is an element of judgment or choice, is that choice subject to policy analysis, which would be socioeconomic or, in this case, military policy? But if the, I thought the rule was that if the action is in violation of a rule that the organization has established, that there could be negligence under the Good Samaritan Rule. It was my understanding that if there is a violation of rules established by the if that caused the injury. Follow me? I follow you. I'm not sure that I believe that's the case. I thought there were quite a few cases from the Sixth Circuit and maybe in the Supreme Court that indicated that, for example, Downs v. United States, are you familiar with that case? That's what the court held there, as I understand it, right? Well That was an intentional tort by the FBI, the situation there, and the court held that it violated a rule that had been established by the FBI, and hence, there could be liability. Well, I believe it was a nondiscretionary rule, and I think the premise of the question began with, is there an element of judgment or choice being exercised? If it is a mandatory rule and there is no element of choice that the federal employee can exercise, then certainly liability could be imposed because the discretionary function exception does not apply. Are these rules under Policy 7 required? Well, no. And let me begin by just going back to Policy 7. And Policy 7 is first implemented because it requires the unit commander to first make a determination as to whether there has been a credible allegation of domestic violence. That is an exercise of judgment or choice by that unit commander. They have to determine, once they receive an allegation, whether or not it is credible. And then, of course, domestic violence is something that is actually defined within the Uniform Code of Military Justice. Isn't that a given here, though, that there was clearly, the proof clearly is that there was knowledge on the part of a lot of people in the Army that there was this possibility, clear possibility of harm? I think the unit commander in May of 2007 did make that determination, that there had been a credible allegation of domestic violence. Subsequent to that, they did not, and one of the— They withdrew that—they withdrew the idea. Right. Policy 7 is not indefinite. It is not, as plaintiffs would suggest, something that is maintained in perpetuity. And I think, as this Court noted, there is a 72-hour cooling-off period. But within 48 hours, and even before, frankly, but if you look at the checklist, within 48 hours, that unit commander is to revisit every item on this checklist and determine whether or not it even applies. And subsequent to May 2007, the determination was that we no longer need to enforce anything or keep this going in perpetuity. Now, there is an allegation— What reason? Because she was no longer under threat? Or they just said, well, you know, we don't have time to fool with this? No, no, certainly not. They determined that she was no longer under threat in that context. I mean, I have to rely on what's alleged in the amended complaint. But she had moved out. She had moved 150 miles away, and there were other—there are other—I'm sorry? After she moved out, weren't there some threats that were brought to the intention of the service? Based on what the amended complaint says, yes, there were. There were some allegations made. There were some comments made. And the unit commander made the determination that these were not credible allegations of domestic violence. And domestic violence is defined as a crime. So that unit commander has to determine whether or not there's been a potential violation of the Uniform Code of Military Justice, federal law, or local law. And, you know, there's no allegation in the amended complaint that the second incident, the one that occurred in August of 2007, the local police that came out didn't even file a police report. And they don't allege that they did. There was no credible allegation at that point as the unit commander determined. And I see that my time is almost up. But I just want to make it clear that, yes, there is an exercise of judgment or choice. But within 48 hours, that unit commander gets to re-exercise and re-engage in making a judgment or decision. But you would concede, wouldn't you, if there was evidence that the Army induced reliance to Tracy Burke, that that then would state a claim? I think if they allege detrimental reliance, that is a necessary element of the Good Samaritan Doctrine. I don't believe they have in their amended complaint, though. Thank you. Your Honors, at paragraph 39 of our amended complaint, we allege, moreover, during this period of separation, this is immediately after the May 26th incident, Tracy informed Burke's chain of command that she feared Burke. She requested a protective order to keep Burke away from her. And she expressed her fear of Burke's access to his weapons. And help me understand where it then alleges that the Army did something upon which she, which induced her reliance. The Army had already done something that had induced her reliance in that they had actually investigated and implemented Policy 7. They had not confiscated his weapons. And so she knew that that was a requirement. The requirement of Policy 7 was that she receive the domestic violence checklist that shows everything that was done. Do you allege that she received it? That's information we just don't have that we're going to have to develop in discovery. But it stands to reason that that's probably what happened. But we don't know that right now because we just haven't had any discovery yet. And I don't want to overly quibble with your honor ever. That's not my goal. But as I read the restatement, the reliance is just, it's a disjunctive element of, there is an undertaking here. And that undertaking was voluntary and on behalf of the Army. And they actually implemented it. And it was in her house, moving her stuff out. Karen and Kirk Comer were there helping her move her stuff out. And she was seeking some sort of safe harbor. I understand they're disjunctive. Help me understand. You're under B. I've been looking at C. The harm is suffered because of a reliance of the other or the third person upon the undertaking. What duty was it that you would specifically point to that they undertook then that she relied upon? Thank you for that. Those duties exist in the full panoply of foreseeability that they have here, knowledge of his previous past, etc. On May 26th, when they failed to confiscate his weapon, that officer, he's a grade E6, that is a specific breach of a duty that is mandatory and something that can't be. Would that, their failure to take it in May? Yes, ma'am. You say would be, could have been violated any time in the future if he used the weapon, even though somebody took it in between and gave it back? Yes, ma'am. Yes, ma'am. There was a 108-day period between the May 26th where Policy 7 was implemented until the murders occur. Policy 7 can't be read as a one and done. What happened was we had the failure to confiscate the weapon. What we don't know yet and haven't alleged but believe is that a military protective order was never issued. What we don't know and haven't been able to allege or find out yet is that he was ordered to, under the rule, he was supposed to be referred to mental health. There were a whole series of things and then the checklist, everything on the checklist and that's where the confiscation of the weapon comes in. So our argument is that the duties were breached on May 26th, a buddy outside of the barracks is told by him, I need to take her in the woods and shoot her. That's reported to his chain of command. And the way Policy 7 reads, it's not that there is a domestic violence crime that has occurred that they intervene in. No. It's you will do this where there is a threat to injure a victim that's part of the military community. You will do these things. So we had a threat in June. We allege there was another domestic violence incident when he was following her around in August. There was another threat in August that he made to a fellow officer. And all of these things are being reported, we allege, up the chain of command and it's something that they know about. And then what happens? The tragic event is his buddy takes his gun from him out of fear knowing that if he's living in the barracks he's not supposed to have a gun in the first place. And so he takes his gun from him, he's talking trash, and he tragically gives him his gun back. Each one of those, all of those events create or constitute a breach of care that has nothing to do with her reliance, Your Honor, is what I'm saying. But we do believe we've got a reliance element here whenever she called and asked for help. Okay, thank you. Thank you. The case will be submitted.